UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

ABNER LOUIMA and MICHELINE LOUIMA,

                         Plaintiffs,

        -against-

THE CITY OF NEW YORK (CITY); THE NEW YORK
CITY POLICE DEPARTMENT (NYPD); THE
PATROLMEN'S BENEVOLENT ASSOCIATION OF
THE CITY OF NEW YORK (PBA); individually and in
their official capacity as New York City Police Officers -
JUSTIN VOLPE, CHARLES SCHWARZ, THOMAS
BRUDER, SERGEANT MICHAEL BELLOMO,
SERGEANT JEFFREY FALLON, FRANCISCO
ROSARIO, ROLANDO ALEMAN, CAPTAIN
WILLIAM F. WALSH, INSPECTOR JEREMIAH
QUINLAN; individually, in his official capacity as a New
York City Police Officer, and as a PBA Delegate -
THOMAS WIESE; in his official capacity as President of
the PBA - LOUIS MATARAZZO; individually and in
their official capacity as employees of the Emergency
Medical Service (EMS) for the City of New York -
WILLIAM PAGAN, FRANK BIRNBAUM; individually,
and in their official capacity as New York City Police
Officers, and in their official capacity as agents of the PBA -
MICHAEL IMMITT, MARCELLA MAKEBISH,
PATRICK O'SULLIVAN; individually and in their official
capacity, JOHN DOES, police officers and non-uniformed
employees of the New York City Police Department, the
identity and number of whom is presently unknown;
individually and in their official capacity as New York
City Police Officers RICHARD ROES, supervisory police
officers of the City of New York, the identity and number
of whom is presently unknown; and individually and in
their official capacity as police officers and/or agents for
the PBA - WILLIAM WOES, agents for the PBA, the
identity and number of whom is presently unknown,

                      Defendants.

-----------------------------------------------------------------x

**VERIFIED COMPLAINT
AND JURY DEMAND**

Civil No.

CV 98 5083
JOHNSON, J.

POLLAK, M.J.



1



Plaintiffs Abner Louima and Micheline Louima, by and through their attorneys,

Johnnie Cochran, Jr., Peter Neufeld, Barry Scheck, and the law firm of Rubenstein and

Rynecki, state as follows:

## INTRODUCTION

1.    This action arises from one of the most shameful, vicious, and cruel acts of police

brutality in the history of New York City, and the conspiracy to cover it up.

2.    It seeks compensation for the unconstitutional and tortious conduct of police

officers who tortured Abner Louima, police officers who witnessed or were aware

of these events yet failed to report what they knew, thereby creating a "blue wall"

of silence and lies to obstruct justice and prevent the truth from surfacing, and

police supervisors who failed to control subordinates with a history of abusive

behavior.  Ultimately, Mr. Louima and his wife, Micheline, seek redress against

the Patrolmen's Benevolent Association and the City of New York for their

deliberate indifference and negligence with respect to customs, policies, and

practices that permitted, condoned, and preserved a "code of silence" environment

in which the most violent police officers believed they would be insulated from

swift and effective investigation, prosecution, and conviction for even their most

brazen acts of brutality.  The inevitable result of this institutional indifference is

the extraordinary injuries inflicted upon Mr. Louima and his wife.

3.    During the early morning hours of Saturday, August 9, 1997, Abner Louima was

in the process of leaving the Rendez-Vous nightclub on Flatbush Avenue in

2

Brooklyn when he was suddenly knocked to the ground outside the club by one or more police officers, assaulted, handcuffed, and put into a patrol car. On route to the 70th Precinct, the patrol car stopped and he was beaten by police officers Thomas Wiese, Charles Schwarz, Justin Volpe, and Thomas Bruder. Along with the beatings, he endured offensive insults directed at his Haitian ethnicity.

4.      By the time Mr. Louima arrived at the 70th Precinct his face had already been battered into a swollen, bloody pulp. Officers pulled down Mr. Louima's pants while he was standing before the desk sergeant. His obvious injuries and undressed state were ignored by the desk sergeant, Jeffrey Fallon. Naked from the waist down, Mr. Louima was then paraded through the precinct and taken into the bathroom.

5.      In the bathroom, Schwarz held the handcuffed Mr. Louima down while Volpe took a stick and shoved it into Mr. Louima's rectum so hard and deep that it ripped through his colon, penetrated the barrier separating the colon from the bladder and perforated the bladder. Defendant Volpe then removed the stick, which was covered with feces and blood, and shoved it into Mr. Louima's mouth, exhorting him to "eat your shit." The defendants used racial epithets against Mr. Louima, including calling him "nigger."

6.      Mr. Louima was then dragged from the bathroom, with his pants still down and his hands still cuffed behind his back, to a holding cell, where he was kept for several hours before being brought to Coney Island Hospital for medical attention. During

3

that interim period, none of the other officers or supervisory personnel at the precinct who was aware of Mr. Louima's physical injuries took appropriate action to investigate and report the use of excessive force or to ensure prompt medical attention.  When Emergency Medical Service (EMS) was finally summoned, the technicians delayed treatment and filed a false report, thereby assisting the police in covering up the true nature and extent of Mr. Louima's injuries.

7. Throughout his recovery from surgery and treatment in intensive care, from admission on August 9th until false criminal charges were dropped on August 13th, Mr. Louima was handcuffed to his hospital bed and guarded as a prisoner.

8. It is believed the conspiracy to cover up the savage attacks against Abner Louima began as he was being beaten in the patrol car on the way to the 70th precinct and spread quickly beyond the four officers to field sergeant Michael Bellomo and other officers back at the precinct.

9. The Patrolmen's Benevolent Association ("PBA"), upon information and belief, quickly became involved in the conspiracy to cover-up the officers' abominable conduct.

10. Ultimate responsibility for the horrific events of August 9 and their aftermath rests with the City and PBA.  Together they have jointly encouraged  the "code of silence" or "blue wall."  The policy and practice known as the "48 hour rule" prevents law enforcement from questioning police officers suspected of criminal conduct for at least 48 hours.  Although the written policy limits this prohibition to

4

administrative investigations, it is customarily applied to criminal investigations as well. Police officers who commit crime are the only class of criminal suspects in New York City insulated from prompt law enforcement interrogation. The two-day window of opportunity encourages the destruction of evidence, the creation of cover stories, and the pressuring of witnesses. Similarly, the routine policy of the PBA and its agents to conceal as "privileged" admissions of misconduct and crimes by fellow officers, when it is actually their sworn duty to disclose this evidence to police investigators and prosecutors, adds brick and mortar to the "wall."

11. The policies, customs, and practices of the PBA and the NYPD have promoted an atmosphere in which the very worst police officers feel assured that evidence of misdeeds depriving citizens of their civil rights, no matter how awful, will be hidden by PBA representatives and the "code of silence." With the imposition of punitive damages against all defendants with the exception of the City, plaintiffs hope to deter defendants and bring an end to this intolerable cycle of violence and silence.

## JURISDICTION

12. This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988; and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the laws of the State of New York. Jurisdiction is founded upon 28 U.S. C. §§ 1331, 1343(1-4), and 2202. Plaintiffs further invoke the

5

supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

14.    Plaintiffs Abner Louima and his wife, Micheline Louima, are residents of the City of New York.

15.    Defendant, City of New York (City), is a municipal corporation within the State of New York and the public employer of the police officers and Emergency Medical Services technicians named as defendants in this action.

16.    Defendant, New York City Police Department (NYPD), is an agency of the City of New York, existing and operating by virtue of the laws of the State of New York and the City of New York.

17.    Defendant, the Patrolmen's Benevolent Association of the City of New York (PBA), is the union representing approximately 26,000 New York City police officers.

18.    In addition to the facts alleged in the following subparagraphs, the following defendants are all sued in their individual and official capacities and all acted within the scope of their employment and under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York:

a.    Defendant Justin Volpe, at all relevant times, was a police officer of

6

defendant Police Department;

b.    Defendant Charles Schwarz, at all relevant times, was a police officer of defendant Police Department;

c.    Defendant Thomas Bruder, at all relevant times, was a police officer of defendant Police Department;

d.    Defendant Thomas Wiese, at all relevant times, was a police officer of defendant Police Department;

e.    Defendant Sergeant Michael Bellomo, at all relevant times, was a police officer of defendant Police Department;

f.    Defendant Sergeant Jeffrey Fallon, at all relevant times, was a police officer of defendant Police Department;

g.    Defendant Francisco Rosario, at all relevant times, was a police officer of defendant Police Department;

h.    Defendant Rolando Aleman, at all relevant times, was a police officer of defendant Police Department;

i.    Defendant Captain William F. Walsh, at all relevant times, was a police officer of defendant Police Department;

j.    Defendant Inspector Jeremiah Quinlan, at all relevant times, was a police officer of defendant Police Department;

k.    Defendant William Pagan, at all relevant times, was an employee of the Emergency Medical Service of the New York Fire Department;

7

l.      Defendant Frank Birnbaum, at all relevant times, was an employee of the Emergency Medical Service of the New York Fire Department;

m.      Defendant John Does, at all relevant times, were police officers and non-uniformed employees of the defendant NYPD, the identity and number of whom is presently unknown;

n.      Defendant Richard Roes, at all relevant times, were supervisory police personnel of the defendant Police Department, the identity and number of whom is presently unknown;

o.      Defendant Michael Immitt, at all relevant times, was an agent of the PBA acting under its directives and an employee of the defendant Police Department;

p.      Defendant Marcella Makebish, at all relevant times, was an agent of the PBA acting under its directives and an employee of the defendant Police Department;

q.      Defendant Patrick O'Sullivan, at all relevant times, was an agent of the PBA acting under its directives and an employee of the defendant Police Department;

r.      Defendant William Woes, at all relevant times, were agents of the PBA acting under its directives and may have been employees of the defendant Police Department as well, the number and identity of whom is presently unknown.

19.     Defendant Louis Matarazzo, in his official capacity, was at all relevant times, the
        President of the PBA.

## NOTICE OF CLAIM

20.     Plaintiffs, in furtherance of their state causes of action, filed timely notice of claim
        against the City in compliance with General Municipal Law Section 50.

21.     More than 30 days have elapsed since service of said notice and the City has failed
        to pay or adjust the claim.

22.     By stipulation, the City has agreed to dispense with the need to hold a 50-h
        examination of plaintiffs in advance of commencing this lawsuit.

23.     This action has been commenced within one year and ninety days after the
        happening of the events upon which these claims arise.

## FACTUAL AND GENERAL ALLEGATIONS

24.     During the early morning hours of Saturday, August 9, 1997, Abner Louima was
        in the process of leaving the Rendez-Vous nightclub on Flatbush Avenue in
        Brooklyn when he was suddenly, without legal cause, knocked to the ground
        outside the club by one or more police officers. Mr. Louima had not committed
        any criminal offenses.

25.     On the ground, one or more officers continued to assault him. His hands were
        cuffed behind his back and he was placed in the rear of a radio motor patrol car.

26.     Mr. Louima was then transported by defendant police officers Wiese and Schwarz
        in their patrol car to the 70th precinct. During the course of that trip, Mr. Louima,

with his hands cuffed behind his back, was beaten severely by Schwarz and Weise about the face and body, and at a stop on the way to the precinct, defendants Volpe and Bruder joined in the gratuitous beating of Mr. Louima.  Along with the beatings, Mr. Louima endured defendants' offensive and insulting remarks about Mr. Louima's Haitian ethnicity.

27.     Defendant Michael Bellomo was the sergeant on the scene in the general vicinity of the Club Rendez-Vous, responsible for authorizing arrests.

28.     It is believed that Bellomo was aware that Volpe, Schwarz, Weise, and Bruder had unlawfully beaten Mr. Louima on the way to the precinct but instead of voiding the arrest and taking appropriate action against the four officers for their criminal conduct, he assisted the four officers to hinder and prevent their apprehension, trial, and punishment.

29.      By the time Mr. Louima arrived at the 70th Precinct his face had already been battered into a swollen, bloody pulp.  His facial injuries in plain view, Mr. Louima was taken to stand before defendant desk sergeant, Jeffrey Fallon, where his pants were pulled down, leaving him naked from the waist down.  It is believed that Fallon completely ignored the obvious injuries and stripping of Mr. Louima and, later on, Fallon failed to take appropriate action to secure prompt medical attention for Mr. Louima.

30.     In this half-clothed state, Mr. Louima was then paraded through the precinct and taken into the bathroom.

31.   In the bathroom, Schwarz and Volpe administered summary punishment.  Schwarz
      held the handcuffed Mr. Louima while Volpe took a stick and shoved it into Mr.
      Louima's rectum with sufficient force to tear through his internal organs.

32.   Volpe then removed the stick, which was covered with feces and blood, and
      shoved it into Mr. Louima's mouth, exhorting him to "eat your shit."  The
      defendants called him "nigger" and peppered their commands with additional
      ethnic and racist slurs.

33.   Mr. Louima was then dragged from the bathroom, with his pants still down and his
      hands still cuffed behind his back, to a holding cell.  He was placed in the cell with
      his hands still cuffed and his pants still down.

34.   The force used in the street, in the patrol car, and inside the precinct bathroom was
      unnecessary, unreasonable, and excessive.

35.   At no time during the events described above did the defendant officers have
      probable cause for the arrest of Mr. Louima and no legal cause or excuse for his
      seizure.

36.   It is believed that defendants Volpe, Bruder, Schwarz, Wiese, Bellomo, Fallon,
      and John Doe officers and non-uniformed personnel were aware of the beatings
      and torture but failed to report it and failed to protect Mr. Louima while in
      custody.

37.   Under the oath of office and the written rules and regulations promulgated by the
      NYPD, line officers and command personnel have an affirmative duty to intercede

11

and prevent crimes and other misconduct committed by officers and to report such conduct whenever they become aware of it.

38. Mr. Louima asked John Doe police officers and/or non-uniformed personnel, who appeared in the cell room, for medical help but received no assistance for a long time.

39. Defendants Volpe, Bruder, Schwarz, Wiese, Bellomo, Fallon, and John Doe officers and non-uniformed employees knew, or with due diligence should have known of the need to get Mr. Louima immediate medical attention but intentionally, or through their deliberate indifference, declined to make the necessary notifications.

40. Following the beatings in the patrol car, the police should have taken him directly to a hospital instead of the precinct.

41. Following the torture in the bathroom, he should have been immediately transferred to a hospital. Instead, Mr. Louima was detained in a holding cell at the precinct for more than three hours before someone finally insisted that he be brought to an emergency room.

42. When Emergency Medical Service ("EMS") finally arrived, the EMS technicians, William Pagan and Frank Birnbaum, delayed hospital transport and submitted at least one false report, thereby assisting the police to cover up the true nature and extent of Mr. Louima's injuries.

43. Notwithstanding that Mr. Louima told Birnbaum and/or Pagan that he had been

12

brutalized by the police and, in particular, that the police had shoved a stick up his rear end, it is believed the EMS technicians deliberately failed to include that information in their written report.  Instead, the EMS report claims that Mr. Louima described the nature and extent of his injuries and pain without mentioning either the police nor the extreme trauma to his rectum and internal organs. Defendants Pagan and Birnbaum intentionally, or through deliberate indifference, declined to give immediate medical treatment for the acute trauma.

44.    As a direct and proximate result of Birnbaum and Pagan's deliberate indifference, Mr. Louima's physical and psychological pain and suffering were significantly exacerbated.

45.    At some point after the torture in the bathroom, defendant Volpe threatened Mr. Louima that if he told anyone about what the police did to him, Volpe would kill the entire Louima family.

46.    Mr. Louima was eventually taken by EMS ambulance to Coney Island Hospital.  It is believed that John Doe officers who accompanied the ambulance failed to communicate the true nature and extent of the injuries to hospital personnel, causing Mr. Louima further delay in treatment and additional pain and suffering.

47.    Throughout his recovery from surgery and treatment in intensive care, from admission on August 9th until false criminal charges were dropped on August 13th, Mr. Louima was handcuffed to his bed and guarded as a prisoner.

48.    It is believed that the conspiracy to cover up the savage attacks against Abner

13

Louima began as he was being beaten in the patrol car on the way to the 70th precinct and spread quickly beyond the four officers and sergeant Bellomo to the John Doe officers at the precinct who had some awareness of the brutality but failed either to intercede or report it.

49.    It is believed that defendant PBA quickly became involved in the conspiracy and through its agents, played a significant role in advancing the cover-up. When defendant Wiese, himself a PBA representative, and defendants Volpe, Schwarz, and Bruder came under suspicion, they met with union representatives who are also police officers. On information and belief, the union's agents, defendants Michael Immitt, Marcella Makebish, and Patrick O'Sullivan, conferred with the offending officers and received incriminating admissions of criminal behavior. Instead of coming forward and promptly reporting this information as they are obligated to do as police officers, the PBA and their agents suppressed it and instead, adopted a strategy of obstruction.

50.    When PBA agents Immitt, Makebish, and O'Sullivan received subpoenas in January, 1998, to testify about their meetings with Volpe, Schwarz, Bruder, and Wiese, in connection with the Louima torture, they claimed their conversations with fellow officers were privileged. Once the Court ruled there was no privilege, it is believed that one or more of the PBA agents invoked their 5th Amendment right against self incrimination.

51.    The PBA agents' cover-up of wrongdoing in this case is the direct result of the

14

union's policy, custom, and practice of suppressing confessions and admissions of criminal conduct committed by police officers.

52.    Defendants City of New York and PBA have worked together for years to encourage and maintain the "code of silence" and "blue wall." One policy which encourages the "blue wall" is the "48 hour rule" codified in the Patrol Guide, Section 118-9. The section requires that an officer subject to an official investigation be given two business days' notice before being interrogated. An officer who is merely a witness to another officer's criminal conduct must be given four hours before the commencement of questioning. Although the language is limited to administrative investigations and should in theory have no adverse impact on criminal investigations, it is believed that the custom is to apply the rule to criminal investigations as well. Hence, as a rule, no police officer suspected of criminal wrongdoing gets questioned by anyone in law enforcement for at least two days.

53.    It is believed, moreover, that it is up to the PBA to decide who is a witness and who is a target. It is believed that when one or more of the defendant PBA representatives -- Michael Immitt, Marcella Makebish, and Patrick O'Sullivan -- appeared to witness and receive the "48 hour" notifications, the PBA invoked it not just for the four officers who participated directly in the beating and torture of Mr. Louima, but for anyone who may have been in the 70th precinct on the morning of August 9.

15

54. One consequence of the custom of deliberate delay, implemented only for police targets of investigation, is the window of opportunity for the destruction of evidence, the creation of cover stories, and the pressuring of witnesses. For instance in this case:

    a.      The stick used by defendant Volpe was removed from the crime scene;

    b.      It is believed that potentially inculpatory evidence was removed from the lockers of defendants; and

    c.      On information and belief, informal meetings were held among conspirators in an effort to cover up their wrongdoing.

55. The actions of all individual defendants were performed within the scope of their employment and authority, and for whose acts the defendants City and PBA are liable under the doctrine of respondeat superior.

56. The actions of the defendant officers and EMS technicians violated Mr. Louima's clearly established rights under the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments of the Constitution and were the direct and proximate cause of the physical and psychological injuries he suffered.

57. The actions of all defendants were intentional, malicious, and in bad faith, thus giving rise to punitive damages as to all defendants with the exception of the municipality.

## DAMAGES

58. As a direct and proximate result of the said acts of the defendants, Mr. Louima

16

suffered the following injuries and damages:

a.     Violation of his rights under the First, Fourth, Fifth, Eighth,Thirteenth,  and

       Fourteenth Amendments to the Constitution;

b.     Loss of physical liberty;

c.     Life threatening physical injuries, pain and suffering, extreme fear,

       emotional trauma, requiring the expenditure of money for treatment

       expected to last the rest of his life;

d.     Economic damages including loss of income; and

e.     Humiliation, embarrassment, and injury to  reputation.

The physical, psychological, and economic consequences of the defendants' actions

continue to date, and upon information and belief, will continue into the future.

## CAUSES OF ACTION

## COUNT I

### 42 U.S.C. § 1983 CONSPIRACY

59.   Paragraphs 1-58 are incorporated by reference as though fully set forth.

60.   The individual defendants, under color of law, with the exception of Walsh and

      Quinlan, conspired with each other, with the PBA, and with others, reached a

      mutual understanding, and acted to undertake a course of conduct to injure,

      oppress, threaten, and intimidate Abner Louima in the free exercise and enjoyment

      of the rights and privileges and equal protection of the law secured to him by the

      Constitution, including the rights: to be free from the intentional use of

17

unreasonable force; to be free from unreasonable searches and seizures; to associate and speak freely; to have access to and seek redress in the courts; and to be free from false arrest, false imprisonment, and the delay and denial of medical attention.

61.   The PBA through its agents, was a willful participant in joint action with officers acting under color of law.  It is believed that the agents, officers, and members of the PBA participated in the conspiracy to further the purpose and goals of the organization, including the goal of maintaining the "code of silence."

62.   It was part of the conspiracy that the defendants Volpe, Schwarz, Wiese, and Bruder did, among other acts, physically assault Mr. Louima while his hands were cuffed behind his back and while he was in police custody

63.   In furtherance of the conspiracy and to cover up the acts of brutality, defendants engaged in the following:

a.     Falsely arrested and imprisoned Mr. Louima;

b.     Fabricated and contrived the criminal charges lodged against Mr. Louima;

c.     Although they were aware of the brutality, and were required to report it immediately, they deliberately suppressed the truth; and

d.     Submitted false police reports, statements, or testimony to support and corroborate the fabricated charges lodged against Mr. Louima and to insulate Volpe, Schwarz, Wiese, and Bruder from administrative and criminal sanctions.

18

## COUNT II

### 42 U.S.C. § 1983 - UNREASONABLE AND EXCESSIVE FORCE

64.   Paragraphs 1-63 are incorporated by reference as though fully set forth.

65.   By their conduct, defendants Volpe, Schwarz, Wiese, and Bruder, under color of law,  deprived Mr. Louima of his constitutional right to be free from excessive and unreasonable force.

66.   Mr. Louima claims damages for the injuries set forth above.

## COUNT III

### 42 U.S.C. § 1983 - FALSE ARREST AND IMPRISONMENT

67.    Paragraphs 1-66 are incorporated by reference as though fully set forth.

68.   By their conduct and under color of law, defendants Volpe, Schwarz, Wiese, Bruder, and Bellomo deprived Mr. Louima of his constitutional right to be free from false arrest and false imprisonment.

69.   Mr. Louima claims damages for the injuries set forth above.

## COUNT IV

### 42 U.S.C. § 1983 - DELAY AND DENIAL OF MEDICAL TREATMENT AND FAILURE TO PROTECT WHILE IN CUSTODY

70.   Paragraphs 1-69 are incorporated by reference as though fully set forth.

71.   By their conduct and under color of law, defendants Volpe, Schwarz, Wiese, Bruder, Bellomo, Fallon, Pagan, Birnbaum, and John Doe officers, deprived Mr. Louima of his constitutional right to immediate medical treatment and failed to

protect him once he became a prisoner, thus perpetuating and exacerbating his physical and mental pain and suffering.

## COUNT V

## 42 U.S.C. § 1983 - FAILURE TO INTERCEDE

72.    Paragraphs 1-71 are incorporated by reference as though fully set forth.

73.    By their conduct and under color of state law, it is believed defendants Volpe, Schwarz, Wiese, Bruder, Bellomo, Fallon, and John Doe officers each had opportunities to intercede on behalf of Mr. Louima to prevent the excessive use of force but due to their intentional conduct or deliberate indifference declined or refused to do so.

74.    As a direct and proximate result, Mr. Louima suffered the injuries and damages described above.

## COUNT VI

## 42 U.S.C. §§ 1981, 1983 - FIRST, FOURTH, AND FOURTEENTH AMENDMENT VIOLATIONS

75.    Paragraphs 1-74 are incorporated by reference as though fully set forth.

76.    By their conduct and under color of law, with the exception of Walsh and Quinlan, all individual and John Doe officers, including the PBA, deprived Mr. Louima of his First Amendment right to have access to and seek redress in the courts.

77.    The defendants engaged in a cover up in order to conceal the wrongful and unlawful conduct taken against Mr. Louima.

20

78. The defendants' efforts to conceal the truth continue to the detriment of Mr. Louima.

79. As a direct and proximate result, Mr. Louima suffered the injuries and damages described above.

## COUNT VII

### 42 U.S.C. § 1985(3) CONSPIRACY WITH RACIAL ANIMUS

80. Paragraphs 1-79 are incorporated by reference as though fully set forth.

81. The individual defendants, with the exception of Walsh and Quinlan, under color of law, conspired with each other, with the PBA, and with others, reached a mutual understanding, and acted to undertake a course of conduct to injure, oppress, threaten, and intimidate Abner Louima in the free exercise and enjoyment of the rights and privileges and equal protection of the law secured to him by the Constitution including the rights: to be free from the intentional use of unreasonable force; to be free from unreasonable searches and seizures; to associate and speak freely; to have access and seek redress in the courts; and to be free from false arrest, false imprisonment, and the delay and denial of medical attention.

82. The PBA, through its agents, was a willful participant in joint action with officers acting under color of law.

83. It was part of the conspiracy that the defendants Volpe, Schwarz, Wiese, and Bruder did, among other acts, physically assault Mr. Louima while his hands were

21

cuffed behind his back and while he was in police custody.

84. In furtherance of the conspiracy, and to conceal the crimes and misconduct of Volpe, Schwarz, Wiese, and Bruder, all the defendants, with the exception of the municipality, engaged in a cover up.

85. The conduct of the defendants was motivated by racial animus and by their desire to injure, oppress, threaten, and intimidate Abner Louima because of his race, African-American, and because of his birthplace, Haiti.

86. Defendants' racial and ethnic animus was expressed by their racial epithets and ethnically insulting remarks directed at Mr. Louima in the patrol car and at the precinct.

87. As a proximate and direct result of defendants' conduct, Mr. Louima suffered the injuries and damages described above.

## COUNT VIII

### 42 U.S.C. § 1986 ACTION FOR NEGLECT TO PREVENT

88. Paragraphs 1-87 are incorporated by reference as though fully set forth.

89. On information and belief, with the exception of Walsh and Quinlan, the individual named defendants, John Doe defendants, and William Woe defendants had knowledge that a cover up, and 42 U.S.C. 1985(3) conspiracy to cover up the brutality perpetrated against Mr. Louima were in progress, had the power to prevent or aid in preventing the coverup and conspiracy from continuing, and neglected or refused to do so.

22

90.   With reasonable diligence, defendants could have promptly reported the brutality to superiors. Their failure contributed to Mr. Louima's remaining under arrest, guarded, and handcuffed throughout the first five days of surgery, intensive care and hospitalization, thereby exacerbating his pain and suffering and depriving him of access to the courts.

**COUNT IX**

**42 U.S.C. § 1983 SUPERVISORY LIABILITY**

91.   Paragraphs 1-90 are incorporated by reference as though fully set forth.

92.   Defendants Bellomo, Fallon, Walsh, Quinlan, and Richard Roes were, at the relevant times, supervisory personnel at the 70th precinct or in the NYPD, with oversight responsibility for line officers Volpe, Schwarz, Wiese and Bruder, and for Bellomo. They were responsible for training, instruction, supervision, and discipline of the four officers who brutalized Mr. Louima and for Sergeant Bellomo, an accessory after the fact.

93.   It is believed that defendants Bellomo, Fallon, Walsh, Quinlan, and Richard Roes received complaints about the conduct of Volpe, Schwarz, Wiese, Bruder, Bellomo and other officers in the 70th precinct, knew about past complaints, aberrant behavior, and disciplinary infractions, or, in the exercise of due diligence, would have perceived that these officers had conduct and disciplinary problems that posed a pervasive and unreasonable risk of harm to Mr. Louima.

94.   Defendants Bellomo, Fallon, Walsh, Quinlan, and Richard Roes knew, or in the

exercise of due diligence would have known that the conduct of Volpe, Schwarz, Wiese, Bruder, and Bellomo displayed toward Mr. Louima was likely to occur.

95.   It is believed defendants Bellomo, Fallon, Walsh, Quinlan, and Richard Roes failed to take preventative and remedial measures to guard against the brutality and cover up committed by Volpe, Schwarz, Wiese, Bruder, and Bellomo.  Had they taken appropriate action, Mr. Louima would not have been injured.

96.   The failure of Bellomo, Fallon, Walsh, Quinlan, and Richard Roes to supervise and discipline Volpe, Schwarz, Wiese, Bruder, Bellomo and the other officers of the 70th precinct,  amounted to gross negligence, deliberate indifference, or intentional misconduct which directly caused the deprivations suffered by Mr. Louima.

## COUNT X

### 42 U.S.C. § 1983 - MONELL CLAIM

97.   Paragraphs 1-96 are incorporated by reference as though fully set forth.

98.   Prior to August 9, 1997, the City developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of Mr. Louima's rights.

99.   It was the policy and/or custom of the City to investigate inadequately and improperly civilian complaints of police misconduct.  Instead, acts of brutality were tolerated by the City.  The Internal Affairs Bureau (IAB) and the Civilian Complaint Review Board (CCRB) have substantially failed to investigate,

24

deliberate, and discipline transgressors. Since the CCRB became independent in 1993, through December 1996 it received 18,336 complaints, yet the NYPD dismissed only one officer as a result of a CCRB investigation. IAB investigations of brutality rarely lead to administrative trials and when they do, and the charges are somehow sustained, the punishment is minimal, lacking any deterrent effect. Since there is no disciplinary sanction available between thirty days' suspension and dismissal, and dismissal is almost always deemed too harsh, even the most brazen acts of brutality, short of murder, are resolved with a slap on the wrist.

100.  The City has been on notice for more than a generation that brutality is widespread and that particular reforms need to be implemented. From reform-minded Commissioner Patrick Murphy to the Mollen Commission twenty-five years later, the City has been repeatedly cautioned that a systemic tolerance for brutality flourishes throughout the NYPD. Three years before Mr. Louima was brutalized the Mollen Commission report noted, "This tolerance, or willful blindness, extends to supervisors as well. This is because many supervisors share the perception that nothing is really wrong with a bit of unnecessary force and because they believe that this is the only way to fight crime today." Mollen Comm. Report, at 49.

101.  It was the policy and/or custom to supervise and discipline officers inadequately, including the defendant officers, thereby failing to discourage constitutional violations on the part of its police officers.

25

102. It was and is the policy of the City to give police officers suspected of criminally assaulting a civilian a special break -- the "48 hour rule." In the last twenty years, hundreds of civilians have been fatally wounded by police action but only four police officers have been convicted for on duty killings since 1977. The police indicted for serious brutality are a precious few; those convicted can be counted on one's hands.

103. The "48 hour rule" delays questioning of police suspects for two business days, a privilege that no other criminal suspect in New York enjoys and that no other police suspect in any other major city in the nation can hide behind. Moreover, it requires that when the target officer is notified, a PBA representative must be present. The PBA representatives, who are almost always members of the NYPD, hear confessions and admissions of brutality, and then conceal them from the Department, a practice condoned by the Department even though the rules and regulations of the NYPD explicitly prohibit it. Additionally, on information and belief, the PBA representatives utilize the 48 hours to assist target officers in conspiring to cover up their crimes and misconduct and thus avoid detection and punishment.

104. Although the "48 hour rule" is supposed to apply only to administrative investigations, it is the City's custom to apply it to criminal investigations as well. Moreover, the 48 hour delay is expressly limited to targets; mere witnesses are to be accorded a four-hour grace period. The custom, however, is to allow the PBA

26

representative instead of the IAB to decide who is a target and who is a witness. In this case, it is believed the PBA representatives invoked the "48 rule" for everyone who was present at the 70th precinct when Mr. Louima was tortured.

105. Police officers of the City of New York have for years engaged in a pattern and practice of actively and passively covering up the misconduct of fellow officers by failing to come forward or failing to accurately give evidence as to misconduct of which they are aware, thereby establishing and perpetuating a "code of silence."

106. This "code of silence" is a custom deeply ingrained in the members of the New York City Police Department so as to constitute the actual policy of the City of New York.

107. The City has been deliberately indifferent to the need for more or different training, rules and regulations relating to police officers who witness or have information regarding misconduct by fellow officers. The City has failed to properly sanction or discipline officers who are aware of and subsequently conceal and/or aid and abet violations of constitutional rights of citizens by other New York City police officers, thereby causing and encouraging New York City police officers, including the individual defendant officers in this case, to violate the rights of citizens such as Mr. Louima.

108. It is believed the City has maintained no system or an inadequate system of review of officers who withhold knowledge or give false information regarding misconduct by fellow officers. This failure to identify and track such officers,

27

including the defendant officers, or to discipline, more closely supervise, or retrain such officers who engage in the "code of silence," causes New York City police officers to believe that they can engage in misconduct, secure in the knowledge that their fellow officers will neither intervene, nor give evidence against them. These systemic deficiencies include, but are not limited to:

a.   Preparation of investigative reports designed to vindicate the conduct of officers who gave false information about the misconduct of other officers, or who falsely denied knowledge about misconduct which they were in a position to observe.

b.   Preparation of investigative reports which uncritically rely solely on the word of police officers and which systematically fail to credit testimony of non-police witnesses.

c.   Preparation of investigative reports which omit or ignore factual information and physical evidence which contradict the accounts of police officers;

d.   Issuance of public statements exonerating officers involved in such incidents prior to the completion of investigation.

e.   Failure to have meaningful review of investigative reports by responsible superior officers for accuracy or completeness, including consideration of the conduct of officers who were not actively engaged in the misconduct which was the subject of the investigation, and acceptance of conclusions

28

which are not supported by the evidence or which contradict such evidence; and

f.      Failure to identify potential "code of silence" violations and maintain accurate records of allegations of such misconduct.

109.    The City, prior to and at the time of this incident, was aware of the need for more or different training, rules, regulations, investigation and discipline relating to police officers who practice the "code of silence," and was deliberately indifferent to that need.

110.    The foregoing acts, omissions, systemic deficiencies and deliberate indifference to the danger of harm to citizens like plaintiff and the need for more or different training and discipline are policies, practices and customs of the City of New York and have caused police officers, including the officer defendants in this case, to believe that they can violate the rights of citizens with impunity, and that their fellow officers would conceal such conduct, including swearing falsely and committing perjury, all with the foreseeable result that officers are more likely violate the constitutional rights of citizens.

111.    As a direct and proximate result of the City's deliberate indifference, defendants violated Mr. Louima's constitutional rights for which he suffered substantial damages.

29

## COUNT XI

### 42 U.S.C. § 1983 CONSPIRACY BETWEEN CITY AND PBA

112.    Paragraphs 1-111 are incorporated by reference as though fully set forth.

113.    Acting jointly over a period of many years, the City and PBA together established policies and customs which allow even the most brazenly brutal officers to believe that they can use excessive force with impunity.

114.    This conspiracy between the City and the PBA is ultimately responsible for, and the proximate and direct cause of the violation of Abner Louima's rights and the extraordinary injuries that ensued.

## COUNT XII

### PENDENT CLAIM OF GROSS NEGLIGENCE AND NEGLIGENCE

115.    Paragraphs 1 -114 are incorporated by reference as fully set forth.

116.    Defendant PBA has been grossly negligent and negligent in the supervision, training, and monitoring of its representatives who consult with and counsel police officers who are suspected of crimes and misconduct, or police officers who are witnesses to crimes and misconduct by their fellow officers.

117.    The PBA has a duty to make sure its members and PBA representatives, who are also police officers, do not violate their duties as police officers to report crimes and misconduct by fellow officers.

118.    The PBA has been grossly negligent and negligent in the instruction and training it provides to its members with respect to their responsibilities to report crimes or

30

misconduct by other police officers.

119. The PBA has been on notice for many years that its representatives have played a

role in the improper obstruction of criminal investigations of New York City

police officers.

120. The PBA knew or should have known that its policies and practices have

contributed to improper concealment of admissions by police officers to PBA

representatives, and a "code of silence" being followed by police officers, who are

also PBA members, to cover up crimes and misconduct.

121. The PBA knew or should have known that its policies and practices, as well as its

grossly negligent and negligent supervision and training of PBA representatives,

created an atmosphere where the most violent police officers felt assured that their

most brazen acts of misconduct would not be swiftly and effectively investigated

and prosecuted.

122. The mistreatment and torture of Mr. Louima previously set forth, and the

subsequent cover up of those events, were reasonably foreseeable results of the

PBA's negligent conduct.

## COUNT XIII

## PENDENT CLAIM OF ASSAULT AND BATTERY

123.   Paragraphs 1-122 are incorporated by reference as though fully set forth.

124.   By their actions, as set forth above, defendants Volpe, Schwarz, Bruder, and Wiese

committed atrocious acts of battery against Abner Louima which included beating

31

and kicking him about the face and body without cause, threatening to kill him and his entire family, and sodomizing him with a stick at the 70th precinct. This use of physical force against Mr. Louima was unnecessary and excessive.

125.    The City is responsible for the threats and the excessive and unnecessary physical force used by defendants Volpe, Schwarz, Bruder, and Wiese because it occurred while they were acting in the scope of their employment, specifically in the course of arresting Mr. Louima and while they were executing their responsibility to hold safely him in police custody at the 70th precinct.

126.    As a result of these death threats and the excessive and unnecessary physical force used against him, Mr. Louima suffered severe and serious physical and mental injuries.

## COUNT XIV

## PENDANT CLAIMS OF FALSE ARREST AND FALSE IMPRISONMENT

127.    Paragraphs 1-126 are incorporated by reference as though fully set forth.

128.    Abner Louima was wrongfully, unlawfully, and unjustifiably charged, arrested, detained and deprived of his liberty against his will, and was imprisoned by defendants Volpe, Bruder, Schwarz, Wiese, Bellomo, other unknown John Doe police officers and unknown Richard Roe supervisory personnel.

129.    At all relevant times, these defendants acted forcibly in apprehending Mr. Louima.

130.    The wrongful, unjustifiable, and unlawful apprehension, arrest, detention and imprisonment was carried out without a warrant.

131.  After his arrest, Mr. Louima was wrongfully harassed, threatened, and subjected to the taking of mug shots in a particularly humiliating fashion and fingerprinting.

132.  Throughout Mr. Louima's false arrest and imprisonment, defendants Volpe, Bruder, Schwarz, Wiese, Bellomo, other unknown John Doe police officers, and unknown Richard Roe supervisors did not permit him an opportunity to establish his innocence.

133.  At all times mentioned, the unlawful, wrongful, and false arrest and imprisonment of Mr. Louima was without right or probable cause, and was forcible and against his will.

134.  All of the foregoing occurred without any fault or provocation on the part of Mr. Louima.

135.  At all relevant times defendants Volpe, Bruder, Schwarz, Wiese, Bellomo, other unknown John Doe police officers and unknown Richard Roe supervisors who were responsible for the false arrest and imprisonment of Mr. Louima were employees of the NYPD and the City, and were acting for, upon and in furtherance of the business of their employers and within the scope of their employment.

136.  As a result of the false arrest and imprisonment, Mr. Louima was subjected to humiliation, ridicule, and disgrace. He was required to incur bills for legal services rendered, and was otherwise injured and damaged.

## COUNT XV

## PENDENT CLAIMS OF FALSE IMPRISONMENT AGAINST PBA AND ITS REPRESENTATIVES

137.  Paragraphs 1-136 are incorporated by reference as though fully set forth.

138.  Upon information and belief, defendant PBA representatives Michael Immitt, Marcella Makebish, Patrick O'Sullivan, and other unknown William Woe representatives of the PBA consulted with defendants Volpe, Bruder, Schwarz, Wiese, and other unknown John Doe police officers, gathered information that would have helped demonstrate that the arrest and continued detention of Mr. Louima was wrongful, unjustifiable, and unlawful, but nonetheless violated their obligations as police officers to disclose this information.

139.  It is believed that, as a result of the conduct of defendant PBA representatives Michael Immitt, Marcella Makebish, Patrick O'Sullivan, and other unknown William Woe representatives of the PBA, rapid and effective investigation of the false arrest and imprisonment of Mr. Louima was impeded and Mr. Louima's false imprisonment was unnecessarily and wrongfully prolonged.

## COUNT XVI

## PENDENT CLAIMS OF INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

140.  Paragraphs 1-139 are incorporated by reference as though fully set forth.

141.  In the course of battering Mr. Louima about the face and body, sodomizing him with a stick, and falsely arresting and imprisoning him, defendants Volpe, Bruder,

34

Schwarz, Wiese, Bellomo, Fallon, and Other Unknown John Doe Police Officers
embarked on a malicious, willful, and grossly negligent course of conduct intended
to cause Mr. Louima to suffer extreme mental and emotional distress, agony, and
anxiety.

142.   One objective of this extreme and outrageous course of conduct was to inflict
severe mental and emotional distress upon Mr. Louima so as to intimidate, terrify,
and dissuade him from exposing the vicious assault and torture inflicted upon him,
the false arrest and imprisonment, and the unconscionable delay and denial of
medical treatment Mr. Louima endured.

143.   Volpe directly threatened to kill Mr. Louima and his entire family if Mr. Louima
revealed the horrible punishment visited upon him during the course of his false
arrest and incarceration at the 70th precinct; Bruder, Schwarz, Wiese, Bellomo,
Fallon, and Other Unknown John Doe Police Officers either knew or should have
known about these outrageous acts of terror and duress and attempted to stop them
or ameliorate their effects upon Mr. Louima.

144.   Volpe, Bruder, Schwarz, Wiese, Bellomo, Fallon, and other unknown John Doe
police officers either knew or should have known that Mr. Louima had been
severely injured, that failure to get him to a hospital for immediate treatment
would create an unreasonable risk of bodily harm, and that failure to obtain such
treatment promptly would cause Mr. Louima extreme mental pain and anguish;
nonetheless, all of these defendants breached their duty to obtain medical treatment

35

for Mr. Louima.

145.   Defendants Francisco Rosario, Rolando Aleman, and other John Doe unknown police officers intentionally or recklessly caused Mr. Louima to suffer mental and emotional distress by impeding and obstructing the exposure of the vicious battering and torture he suffered, the false arrest and imprisonment he endured, and the wanton delay and denial of medical treatment he experienced.

146.   It is believed that Volpe and unknown John Doe police officers pursued a malicious campaign to inflict mental and emotional distress upon Mr. Louima by spreading false suggestions in the community and press that Mr. Louima had suffered injuries to his colon and rectum as a result of homosexual activity at the Club Rendez-Vous. These false suggestions, as these defendants knew or should have known, caused Mr. Louima humiliation and ridicule.

147.   The aforesaid acts of intentional and reckless infliction of emotional and mental distress by defendants constitute misconduct of an egregious nature that exceeds all bounds usually tolerated by a civilized society.

## COUNT XVII

### PENDENT CLAIMS OF NEGLIGENCE FOR FAILING TO CARE, PROTECT, AND OBTAIN MEDICAL TREATMENT

148.   Paragraphs 1-147 are incorporated by reference as though fully set forth.

149.   As New York City police officers, Volpe, Bruder, Schwarz, Wiese, Bellomo, Fallon, and other unknown John Doe police officers had a duty to care, protect,

36

and obtain medical treatment for Mr. Louima while he was being held as a prisoner at the 70th Precinct.

150. These defendants knew or should have known about the severe injuries Mr. Louima had suffered and were negligent in their failure to protect him from further injury at the precinct and their failure to prevent an unconscionable and unnecessary denial and delay in medical treatment and transport to a hospital.

## COUNT XVIII

### PENDENT CLAIM OF PRIMA FACIE TORT

151. Paragraphs 1-150 are incorporated by reference as though fully set forth.

152. By their actions, as set forth above, defendants Volpe, Bruder, Schwarz, Wiese, Bellomo, Fallon, and other unknown John Doe police officers inflicted harm upon Mr. Louima, without excuse or justification, out of disinterested malevolence.

## COUNT XIX

### PENDENT CLAIMS OF MAKING AN INJURIOUS FALSE OR FRAUDULENT STATEMENTS

153. Paragraphs 1-152 are incorporated by reference as though fully set forth.

154. William Pagan and Frank Birnbaum, as employees of Emergency Medical Service who responded to the 70th Precinct on August 9, 1997 to treat Mr. Louima and transport him to a hospital, had an obligation to accurately and reliably report information that would be relevant to Mr. Louima's care and treatment.

155. Nevertheless, Pagan and Birnbaum intentionally omitted in their Ambulance Call

Report Mr. Louima's statements to them that he had been beaten by police officers, and had a stick shoved into his rear end and instead falsely stated that Mr. Louima had told them he had been punched, kicked, and hit, without any reference to the police or to the acute trauma to his rectum and internal organs.

156.   The false information provided by Pagan and Birnbaum in their Ambulance Call Report and at other times before, during, and after Mr. Louima was transported to Coney Island Hospital, damaged Mr. Louima by delaying and denying him medical treatment and by causing him fear, pain and anguish.

## COUNT XX

**PENDENT CLAIMS OF GROSS NEGLIGENCE AND NEGLIGENCE AND INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

157.   Paragraphs 1-156 are incorporated by reference as though fully set forth.

158.   Pagan and Birnbaum, as EMS employees, were grossly negligent and negligent in that they had a duty to care for Mr. Louima which they violated by delaying and denying him prompt treatment and transport to the hospital, by providing false information about the source, nature, and extent of his injuries, and by failing to take steps that an ordinarily reasonable and prudent person would have pursued to care and protect Mr. Louima.

159.   Pagan and Birnbaum knew or should have known that their denial and delay of treatment and transport of Mr. Louima created an unreasonable risk of bodily harm and did cause Mr. Louima mental distress and anguish.

38

## COUNT XXI

### PENDENT CLAIM - RESPONDEAT SUPERIOR

160. Paragraphs 1-159 are incorporated by reference as though fully set forth.

161. At all relevant times, all defendant employees of the City of New York were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

162. Consequently, the City is liable under the doctrine of respondeat superior for their tortious actions.

## COUNT XXII

### 42 U.S.C. § 1983 AND PENDENT CLAIM BY MICHELINE LOUIMA

163. Paragraphs 1-162 are incorporated by reference as though fully set forth.

164. At all times relevant to this action, Micheline Louima was and is the lawful spouse of Abner Louima and as such was and is entitled to the comfort, enjoyment, society and services of her spouse. By reason of the foregoing conduct by defendants, Micheline Louima was deprived of the comfort and enjoyment of the services and society of her spouse, which are guaranteed to plaintiff under the laws and constitution of the State of New York and can be adjudicated in this litigation under the Court's supplementary jurisdiction. Moreover, defendants' conduct undermined Micheline Louima's liberty interest in preserving the integrity and stability of the marital relationship from intervention by the state without due process of law.

39

**WHEREFORE**, plaintiffs request the following relief jointly and severally as against all of the defendants:

1. Award compensatory damages in an amount to be determined at trial;

2. Award punitive damages in an amount to be determined at trial;

3. Disbursements, costs, and attorneys' fees; and

4. For such other and further relief as to this Court may seem just and proper.

## PLAINTIFFS DEMAND TRIAL BY JURY

Dated: New York, New York
August 6, 1998

Respectfully submitted,

_____
JOHNNIE L. COCHRAN, JR. /4361
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 625-1908

_____
PETER J. NEUFELD /2746
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9380

_____
BARRY C. SCHECK /4612
Benj. N. Cardozo School of Law
55 Fifth Avenue
New York, New York 10003
(212) 790-0368

_____
SANFORD A. RUBENSTEIN /4488
Rubenstein & Rynecki
16 Court Street
Brooklyn, New York 11241
(718) 522-1020